**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


LORI MCLAUGHLIN,           )
                                  )
            Plaintiff,      )
                                  )     Civil Action No. 11-687
          v.                 )
                                  )     Judge Mark R. Hornak
MICHAEL J. ASTRUE,       )     Magistrate Judge Lisa Pupo Lenihan
Commissioner of Social Security,   )
                                  )
           Defendant.    )


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION


## I. RECOMMENDATION

It is respectfully recommended that the Court deny Plaintiff's Motion for Summary Judgment, grant Defendant's Motion for Summary Judgment, and affirm the decision of the administrative law judge ("ALJ").


## II. REPORT

### A. BACKGROUND

Lori McLaughlin ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 – 1383f ("Act"). Plaintiff filed on November 21, 2008, claiming an inability to work as of December 30, 2007 due to disability resulting primarily from alleged anxiety, panic disorder, and seizures, but also a number of physical

conditions.  (R. at 100 − 02, 126 − 33, 150 − 57)[1].  This matter comes before the court on cross motions for summary judgment.  (ECF Nos. 8, 11).

## 1.  General

Plaintiff was born on July 6, 1963, and was forty six years of age at the time of her administrative hearing before the ALJ.  (R. at 100 − 02).  Plaintiff lived with her sixteen year old daughter and subsisted on welfare benefits from the state.  (R. at 42 − 43).  Plaintiff completed the ninth grade, but had no vocational or post-secondary education.  (R. at 43).  She maintained a driver's license.  (R. at 43).  She was last gainfully employed in 2004 as a laborer at a bridge building company.  (R. at 43, 128).

In a self-evaluation, Plaintiff indicated that she did not do much during the day outside of taking her daughter to the bus stop, cooking, and occasionally visiting her family.  (R. at 134 − 41).  She claimed to spend most of the day sleeping, and stated that she was generally in continuous physical pain.  (R. at 134 − 41).  Plaintiff alleged that since her disability onset, she has had difficulty sleeping, working, cleaning, exercising, and dealing with other people and stress.  (R. at 134 − 41).  She had no problems caring for herself, however, and still managed housework and yardwork.  (R. at 134 − 41).  Plaintiff also drove independently and shopped.  (R. at 134 − 41).  She indicated that she could handle her own finances.  (R. at 134 − 41).

## 2.  Physical Treatment History

Plaintiff's primary care physician was James K. Tatum, M.D.  During his treatment of Plaintiff, Dr. Tatum regularly noted diagnoses of seizure disorder, hepatitis C, and digestive disorders.  (R. at 228 − 231, 276 − 79, 356 − 59).  He also frequently noted Plaintiff's complaints of depression.  (R. at 228 − 231, 276 − 79, 356 − 59).  Dr. Tatum once ordered an x-ray of Plaintiff's lumbar spine subsequent to a fall in February of 2008; it revealed no significant

---

[1]          Citations to ECF Nos. 3 − 3-14, the Record, *hereinafter*, "R. at __."

abnormalities. (R. at 170, 242). A stress test ordered by Dr. Tatum on October 3, 2008 in response to complaints of shortness of breath, chest pain, and arm pain also revealed no abnormalities. (R. at 236 – 37).

Plaintiff was admitted to Heritage Valley Medical Center in Beaver, Pennsylvania on October 25, 2008 for lower left quadrant pain. (R. at 173 – 74, 263 – 64). She was treated by Dr. Tatum. (R. at 173 – 74, 263 – 64). A CT scan of the abdomen and pelvis revealed the presence of diverticulitis. (R. at 173 – 74, 263 – 64). Her condition improved and she was discharged on October 29. (R. at 173 – 74, 263 – 64). Plaintiff was advised to report for a follow-up in one week and to schedule a colonoscopy. (R. at 173 – 74, 263 – 64). There is no record of either event.

On December 1, 2008, Plaintiff appeared at Dr. Tatum's office complaining of right knee pain following a fall while out dancing. (R. at 222). Her knee was swollen and bruised, and made it difficult to walk. (R. at 222). Plaintiff's range of motion was intact, however. (R. at 222). Dr. Tatum prescribed ibuprofen, and referred Plaintiff for an orthopedic consultation. (R. at 222). She missed a scheduled follow-up with Dr. Tatum on February 19, 2009. (R. at 222).

On January 30, 2009, during a routine evaluation, Plaintiff's neurologist Barry R. Reznick, M.D. indicated that Plaintiff's long-diagnosed seizure disorder was controlled on medication, and that she suffered no ill-effects. (R. at 213 – 14). She was to be maintained on a brand name anti-seizure medication, as Plaintiff complained that the generic form did not feel as effective. (R. at 213 – 14). At her next evaluation on January 7, 2010, Dr. Reznick opined that Plaintiff's seizure disorder was unchanged, and that she was doing well. (R. at 360 – 61).

Due to continuing complaints of abdominal pain pelvic pain, and backache, in addition to a history of interstitial cystitis, Plaintiff underwent a diagnostic laparoscopy on March 2, 2009.

(R. at 254 − 60).  Based upon the results, Plaintiff was recommended for a total abdominal hysterectomy.  (R. at 254 − 60, 341 − 45).  She underwent the procedure on April 16, 2009, without complications.  (R. at 254 − 60, 341 − 45).

On May 29, 2009, Plaintiff appeared at the Heritage Valley Medical Center emergency department due to aching pain all over her body for approximately one month.  (R. at 370 − 71). Plaintiff complained of some nausea, headache, and some chest pains.  (R. at 370 − 71).  A chest x-ray, CT scan of the head, and blood tests all returned normal results.  (R. at 370 − 71).  Staff indicated that Plaintiff's anxiety may have been a source of her pain.  (R. at 370 − 71).  She was advised to rest.  (R. at 370 − 71).  She was released in stable condition.  (R. at 370 − 71).

By February 2010, Plaintiff had still not undergone a colonoscopy as advised several years earlier, despite experiencing abdominal pain, diverticulitis, bowel irregularities, and bleeding.  (R. at 366 − 67).  Records from Heritage Valley Medical Center noted that within the time period since a colonoscopy had initially been recommended, Plaintiff had her gallbladder removed and had a hysterectomy performed.  (R. at 366 − 67).  Plaintiff also had a history of bladder irrigations for interstitial cystitis.  (R. at 366 − 67).  A colonoscopy was attempted on February 23, but was not completed because of difficulty maneuvering the scope internally.  (R. at 369).

### 3.  Psychiatric Treatment History

The record indicated that Plaintiff began medication management of her psychiatric conditions with Rajendra K. Nigam, M.D. on June 19, 2002.  (R. at 210 − 11).  Plaintiff was to be treated for major depression and potential panic disorder, and was to see Dr. Nigam for regular follow-ups.  (R. at 210 − 11).

The record did not include further psychiatric treatment notes until April 23, 2007, and revealed that Plaintiff was stable, experienced no medication side effects, had a good mood, was generally doing well, had congruent affect, logical thought, intact insight and judgment, and was making good overall progress. (R. at 207 – 09). Plaintiff was assessed a global assessment of functioning[2] ("GAF") score of 75. (R. at 207). In further treatment notes dated July 16, 2007, Plaintiff's condition was generally the same, except that she had recently experienced an uptick in stress, and her mood was noted to be depressed and anxious. (R. at 206). Her progress was considered to be only fair. (R. at 208).

Plaintiff began to engage in psychotherapy on July 19, 2007. (R. at 204 – 05). Plaintiff claimed that she had difficulty with sleep, motivation, and isolation. (R. at 203 – 05). Plaintiff also stated that she had a history of verbally abusive relationships with former paramours, that she had low self-esteem, and that she had struggled with intermittent intervals of depression and anxiety for approximately eight years. (R. at 203 – 05). The clinical therapist observed Plaintiff to have an appropriate appearance, congruent affect, cooperative attitude, logical thought,

---

[2]     The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 91 – 100 exhibits "[s]uperior functioning in a wide range of activities" and "no symptoms;" of 81 – 90 exhibits few, if any, symptoms and "good functioning in all areas," is "interested an involved in a wide range of activities," is "socially effective," is "generally satisfied with life," and experiences no more than "everyday problems or concerns;" of 71 – 80, may exhibit "transient and expectable reactions to psychosocial stressors" and "no more than slight impairment in social, occupational, or school functioning;" of 61 – 70 may have "[s]ome mild symptoms" or "some difficulty in social, occupational, or school functioning, but generally functioning pretty well" and "has some meaningful interpersonal relationships;" of 51 – 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 41 – 50 may have "[s]erious symptoms (e.g., suicidal ideation …)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 31 – 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood;" of 21 – 30 may be "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., … suicidal preoccupation)" or "inability to function in almost all areas;" of 11 – 20 may have "[s]ome danger of hurting self or others" or "occasionally fails to maintain minimal personal hygiene" or "gross impairment in communication;" of 1 – 10 may have "[p]ersistent danger of severely hurting self or others" or "persistent inability to maintain minimal personal hygiene" or "serious suicidal act with clear expectation of death." *Id.*

appropriate thought content, and intact memory, insight, and judgment.  (R. at 203 – 05).  She had agitated motor activity, an anxious mood, and excessive speech.  (R. at 203 – 05).  Plaintiff was diagnosed with major depression, and was assessed a GAF score of 60.  (R. at 203 – 05).  Plaintiff's mental state was attributed to family/relationship difficulties and health problems.  (R. at 203 – 05).  She was advised to attend psychotherapy routinely.  (R. at 203 – 05).

Plaintiff attended an initial session with her clinical therapist on August 9, 2007.  (R. at 201).  The therapy notes focused upon Plaintiff's complaints of difficulty with her family, friends, and significant other.  (R. at 201).  Plaintiff's thoughts were logical and her affect was appropriate, but her mood was depressed.  (R. at 201).  Her outlook was considered to be poor.  (R. at 201).  She was given a GAF score of 55.  (R. at 201).

On August 15, 2007, Plaintiff was evaluated by Dr. Nigam, who indicated that her depression, anxiety, motivation, and energy had worsened.  (R. at 200).  This change in Plaintiff's condition was attributed to relationship issues with her significant other.  (R. at 200).  She was otherwise unremarkable, and was given a GAF score of 55.  (R. at 200).  On August 16, Plaintiff was seen by her clinical therapist.  (R. at 199).  Plaintiff was still depressed.  (R. at 199).  Her session was devoted to discussion of relationship problems with her significant other.  (R. at 199).  Her progress was noted as fair.  (R. at 199).  Her GAF score was 55.  (R. at 199).

At further psychotherapy sessions through the remainder of 2007, Plaintiff's issues remained largely the same, and were rooted in her relationships.  (R. at 190, 194 – 95, 197 – 98).  Her GAF scores ranged from 55 to 69, and her progress was noted to be fair to good – generally improving over time.  (R. at 190, 194 – 95, 197 – 98).  Concurrently, at regular medication management appointments with Dr. Nigam, Plaintiff was noted to show progressively fair to good improvement; although, she experienced some spikes in depression and anxiety due to

relationship issues.  (R. at 191, 193, 196).  Her GAF score ranged between 55 – 69, increasing over time.  (R. at 191, 193, 196).

The record was silent until March 6, 2008, when Plaintiff appeared for medication management with Dr. Nigam.  (R. at 189).  Plaintiff was noted to be in fair condition, but complained of panic attacks.  (R. at 189).  She was otherwise unremarkable and did not experience any medication side effects.  (R. at 189).  Her GAF score was 65.  (R. at 189).  In April, Dr. Nigam downgraded Plaintiff's GAF score to 60, due to worsening depression, motivation, and energy.  (R. at 188).  Dr. Nigam changed one of Plaintiff's medications due to ineffectiveness.  (R. at 188).  By June 2008, Plaintiff's GAF score was 70, and Dr. Nigam indicated that Plaintiff was doing well, overall.  (R. at 187).  Plaintiff's mental condition continued this trend through November 2008, though physical health issues were noted.  (R. at 185 – 86).  Plaintiff also complained of tiredness despite sleeping well.  (R. at 185 – 86).  Her mood was noted to be good.  (R. at 185 – 86).

According to Dr. Nigam, however, Plaintiff's condition worsened markedly in December 2008.  (R. at 184).  Plaintiff's GAF score was decreased to 60, and she was noted to complain of poor sleep patterns and worsened depression, anxiety, motivation, and energy.  (R. at 184).  By her next evaluation with Dr. Nigam on January 22, 2009, Plaintiff's GAF score was once again at 70, her alertness, activity, and energy had all improved, she was making good progress, and she was otherwise unremarkable.  (R. at 182).

On April 9, 2009, Plaintiff's GAF was dropped to 60.  (R. at 417).  Her progress and mental status were noted to be fair, but she experienced fatigue, insomnia, and anxiety frequently.  (R. at 417).  It was noted that she was to undergo a hysterectomy in a few days.  (R. at 417).  At regular sessions between the following May of 2009 and March of 2010, Dr. Nigam

noted Plaintiff's GAF scores to range between 50 and 69, all but two scores being at 60 and above. (R. at 390, 392, 395, 398, 401, 404, 408, 412, 414 – 16). Plaintiff generally progressed at a fair to good rate during this period, particularly toward the end when she was noted multiple times as doing well overall. (R. at 390, 392, 395, 398, 401, 404, 408, 412, 414 – 16). The most severe dip in her functioning and GAF scores correlated with a noted failure to comply with her prescription medication regimen. (R. at 415). When compliant, her anxiety, panic, and irritability decreased, and her mood and sleep improved. (R. at 390, 392, 395, 398, 401, 404, 408, 412, 414 – 16). She still cited frequent issues with personal relationships. (R. at 390, 392, 395, 398, 401, 404, 408, 412, 414 – 16). Suicidal ideation was never found. (R. at 390, 392, 395, 398, 401, 404, 408, 412, 414 – 16). Medication side effects were always indicated to be absent. (R. at 390, 392, 395, 398, 401, 404, 408, 412, 414 – 16).

During this same period, Plaintiff began to regularly engage in psychotherapy after an eighteen month hiatus. (R. at 393 – 94, 396 – 97, 400, 402 – 03, 405 – 07, 409 – 11, 413). Following her return to therapy, Plaintiff's clinical therapist generally noted her GAF scores to range between 56 and 67. (R. at 393 – 94, 396 – 97, 400, 402 – 03, 405 – 07, 409 – 11, 413). Plaintiff was observed to have depressed mood, anxious affect, logical thought processes, no suicidal ideation, and personal relationship and medical issues. (R. at 393 – 94, 396 – 97, 400, 402 – 03, 405 – 07, 409 – 11, 413). Yet, Plaintiff progressed at a fair to good rate, particularly later in therapy – generally seeing improvement with all the aforementioned symptomology. (R. at 393 – 94, 396 – 97, 400, 402 – 03, 405 – 07, 409 – 11, 413). Her most typical formal diagnoses were major depression and panic disorder. (R. at 393 – 94, 396 – 97, 400, 402 – 03, 405 – 07, 409 – 11, 413).

In the last medication management progress note on the record from May 5, 2010, Dr. Nigam indicated that Plaintiff's diagnoses had not changed, that her panic attacks had worsened, and that she experienced relationship stressors, financial issues, and transportation issues. (R. at 388). Plaintiff was anxious, but her affect was congruent, her thoughts were logical, her insight and judgment were intact, she had no suicidal ideation, her progress was fair, and she had no medication side effects. (R. at 388). Plaintiff's GAF score was 59. (R. at 388).

In her last two psychotherapy notes from May 2010, Plaintiff's clinical therapist diagnosed Plaintiff with panic disorder, only. (R. at 387, 389). Plaintiff's difficulties with her relationships were still considered to be the root of her psychological issues. (R. at 387, 389). As a result, her mood was depressed, and her affect was anxious; but, her thoughts were logical. (R. at 387, 389). Further, Plaintiff claimed to have up to fifteen panic attacks per day. (R. at 387, 389). Plaintiff's last GAF scores from the psychotherapy record were 59 and 60. (R. at 387, 389).

### 4. Functional Capacity Assessments

Dr. Reznick completed a functional capacity assessment based upon the effects of Plaintiff's seizure disorder, and concluded that Plaintiff was capable of frequently lifting twenty-five pounds and occasionally lifting fifty. (R. at 215 – 16). Plaintiff could frequently carry twenty pounds and occasionally carry twenty-five. (R. at 215 – 16). Plaintiff could only occasionally balance or climb, and needed to avoid heights. (R. at 215 – 16). Plaintiff was not otherwise limited. (R. at 215 – 16).

State agency evaluator Thomas Williamson completed a physical residual functional capacity ("RFC") assessment of Plaintiff on April 21, 2009. (R. at 74 – 80). Plaintiff was diagnosed with a controlled seizure disorder. (R. at 74 – 80). Plaintiff had no limitations and no

significant limitation in activities of daily living. (R. at 74 – 80). Mr. Williams concluded by stating that the findings made by Plaintiff's neurologist indicated that there were no functional problems associated with her seizure disorder, and that it was controlled with medication. (R. at 74 – 80).

On April 21, 2009, state agency consultant Michelle Santilli, Psy.D. completed a mental RFC assessment based upon Plaintiff's medical records. (R. at 320 – 22). Ms. Santilli found Plaintiff to be moderately to not significantly limited in all areas of functioning. (R. at 320 – 22). She diagnosed Plaintiff with affective disorders – specifically – major depressive disorder. (R. at 320 – 22). Plaintiff was found to be capable of performing simple, routine, repetitive work in a stable environment. (R. at 320 – 22). Plaintiff could perform one and two step tasks, could sustain an ordinary routine without supervision, had functional social skills, and engaged in regular activities of daily living. (R. at 320 – 22). Plaintiff's basic memory processes were intact, as well. (R. at 320 – 22). As such, Plaintiff was considered capable of engaging in full-time employment. (R. at 320 – 22).

On June 8, 2009, Dr. Nigam completed a functional assessment of Plaintiff's capabilities. (R. at 337 – 39). Dr. Nigam listed diagnoses of major depression and panic disorder without agoraphobia. (R. at 337 – 39). Plaintiff's GAF score was 50, and Dr. Nigam listed Plaintiff's highest score from the past year as 69. (R. at 337 – 39). Plaintiff was indicated as suffering from poor memory, appetite disturbance with weight change, sleep disturbance, mood disturbance, emotional lability, recurrent panic attacks, anhedonia, psychomotor retardation, feelings of guilt/worthlessness, difficulty thinking/concentrating, fleeting suicidal ideation, social withdrawal, blunt/flat/inappropriate affect, decreased energy, generalized persistent anxiety, and irritability. (R. at 337 – 39).

Plaintiff was rated as "poor" with respect to her ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stress, function independently, and maintain concentration and attention. (R. at 337 − 39). Plaintiff was also "poor" with respect to understanding, remembering, and carrying out job instructions, maintaining personal appearance, behaving in an emotionally stable manner, relating predictably in social situations, and demonstrating reliability. (R. at 337 − 39). Dr. Nigam described Plaintiff as severely depressed, lacking motivation and energy, and incapable of maintaining her own household, paying her bills, and caring for her daughter. (R. at 337 − 39). Plaintiff exhibited poor focus, poor comprehension, did not groom regularly, and was emotionally unstable. (R. at 337 − 39). Plaintiff could, however, manage disability benefits in her own best interest. (R. at 337 − 39).

On May 18, 2010, Dr. Tatum completed a Medical Statement Regarding Social Security Disability Claim. (R. at 381 − 84). In it, he indicated that Plaintiff suffered from anxiety, depression, and panic disorder. (R. at 381 − 84). Physical diagnoses included interstitial cystitis, and seizure disorder. (R. at 381 − 84). Based upon her diagnosed conditions, Dr. Tatum felt that Plaintiff was physically capable of only occasionally lifting and carrying ten pounds, standing and walking less than two hours of an eight hour work day, and occasionally climbing, balancing, stooping, kneeling, crouching, and crawling, and that she must avoid poor ventilation, heights, and moving machinery. (R. at 381 − 84). Plaintiff was further found to have difficulty with her mood, concentration, and fatigue − requiring rest periods throughout the work day. (R. at 381 − 84). Plaintiff would need to elevate her legs occasionally throughout the day. (R. at 381 − 84). Plaintiff was otherwise physically unlimited. (R. at 381 − 84). Although her pain was only moderate, Dr. Tatum attributed the loss of interest in almost all activities, appetite

disturbance and weight loss, sleep disturbance, crying spells, decreased energy, difficulty concentrating, and had marked limitation/restriction in her activities of daily living, social functioning, and concentration, persistence, and pace, to Plaintiff's pain. (R. at 381 – 84). As a result of all of the above, Dr. Tatum also believed that Plaintiff had no capacity to work. (R. at 381 – 84).

### 5. Administrative Hearing

At the hearing, the ALJ began by questioning Plaintiff regarding the reasons she left her last place of employment. (R. at 44). Plaintiff indicated that the prescription medications that she took made her too drowsy. (R. at 44). She testified that she was also consistently fatigued. (R. at 45). The ALJ asked Plaintiff to state why she believed that she was unable to engage in other full-time work. (R. at 46). Plaintiff explained that she was very tired, suffered from panic disorder and anxiety, was depressed, had difficulty interacting with groups of people, and preferred to isolate herself. (R. at 46 – 48). She claimed that she experienced up to fifteen panic attacks per day. (R. at 52). She testified that her doctor adjusted her medication regimen to treat this problem, and it helped. (R. at 52 – 53). Despite the positive effects of her prescription medications on her mental state, however, the medications allegedly made her significantly fatigued during the day. (R. at 54).

Plaintiff did not believe that there was anything which physically prevented her from working. (R. at 47). Plaintiff felt that she could not lift much weight, however, and her alleged regular need for bladder irrigations due to interstitial cystitis were limiting. (R. at 48 – 50). Plaintiff also claimed that she had experienced a breakthrough seizure approximately a year-and-a-half prior to the hearing. (R. at 51). This was allegedly due to a switch in her anti-seizure medication. (R. at 51).

In terms of regular, everyday activities, Plaintiff testified that she was capable of completing yard work, but spread the work out by dividing it into manageable tasks. (R. at 46, 55). She cooked meals, drove independently, visited her friend, occasionally babysat grandchildren, walked to a nearby creek to relax, regularly watched television, occasionally read books and the newspaper, went dancing every two weeks at a social club, and went shopping. (R. at 47, 55 – 59). She also performed household chores such as mopping her floors. (R. at 54).

For a time, partly as a hobby, and party as a means of generating additional income, Plaintiff described doing arts and crafts-type work. (R. at 45). Specifically, Plaintiff would paint pictures and decoupage pieces of slate for sale at a local market. (R. at 45). She explained that the work was physically demanding, because she would buy large pieces of slate which she would then need to lift and cut into convenient sizes. (R. at 45 – 46). She claimed that the work was debilitating for her arms and hands. (R. at 45 – 46).

Following Plaintiff's testimony, the ALJ questioned a vocational expert regarding Plaintiff's limitations. The ALJ asked whether a hypothetical person of Plaintiff's age, educational experience, and work background could engage in medium exertional work if limited to lifting and carrying no more than fifty pounds occasionally and twenty-five pounds frequently, standing and walking for six hours of an eight hour workday, sitting six hours, no climbing of ladders, ropes, or scaffolds, only occasional balancing, stooping, kneeling, crouching, and crawling, no exposure to heights, moving machinery, and crowds, only occasional interaction with co-workers or the public, and performing no more than simple, routine, repetitive tasks in a low stress work environment with only occasional simple decision making or changes in work setting. (R. at 61 – 62).

The vocational expert responded by stating that such a person could find work as a "dishwasher," with 509,000 positions available in the national economy, "laundry worker," with 50,000 positions available, and "packer," with 105,000 positions available. (R. at 62). The ALJ followed up by asking what jobs would be available if the hypothetical person were limited to light work. (R. at 62). The vocational expert replied that such a person could still be a "laundry worker" or "packer," but also could work as a "parking lot attendant," with 82,000 positions available. (R. at 62 – 63). The vocational expert went on to state that even at the sedentary level, the position of "packer" would be available, but the hypothetical person could also work as a "alarm monitor" or "surveillance system monitor," with 81,000 positions available, or as a "ticket checker," with 77,000 positions available. (R. at 63).

The ALJ asked whether jobs would be available if the hypothetical person would be off task for fifteen to twenty percent of a given work day, or would be absent more than once per month. (R. at 63). The vocational expert indicated that no jobs would be available with either limitation. (R. at 63 – 64).

**B.     ANALYSIS**

**1. Standard of Review**

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). When

reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[3] and 1383(c)(3)[4]. Section 405(g) permits a district court to review

---

[3] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[4] Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986).

### 2. Discussion

The ALJ determined that Plaintiff suffered medically determinable severe impairments in the way of major depression, panic disorder without agoraphobia, seizure disorder, diverticulitis, hepatitis C, and interstitial cystitis. (R. at 10). Despite limitations attributable to said

impairments, the ALJ found that Plaintiff was capable of engaging in light exertional work on a full-time basis, including lifting and carrying twenty pounds occasionally and ten pounds frequently, but limited to standing and walking no more than six hours of an eight hour work day, no climbing of ladders, ropes, or scaffolds, only occasional climbing of ramps and stairs, only occasional balancing, stooping, kneeling, crouching, and crawling, no exposure to heights or moving machinery, only occasional interaction with co-workers and the public, and no more than simple decision making and occasional changes in the work setting. (R. at 14). Based upon the testimony of the vocational expert, the ALJ concluded that a significant number of qualifying jobs existed in the national economy, and Plaintiff was not, therefore, entitled to disability benefits. (R. at 35 – 36).

Plaintiff objects to the determination of the ALJ, arguing that he erred in discounting Dr. Tatum and Dr. Nigam's functional capacity assessments, and that he had no basis for discrediting Plaintiff's subjective complaints of pain and limitation. (ECF No. 9 at 4 – 10). Defendant counters that the ALJ provided an extremely thorough review of the case record, properly addressed all pertinent information, and supported his decision with substantial evidence from objective medical findings. (ECF No. 12 at 8 – 13).

As an initial matter, when rendering a decision, an ALJ must provide sufficient explanation of his or her final determination to provide a reviewing court with the benefit of the factual basis underlying the ultimate disability finding. *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981) (citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). The ALJ need only discuss the most pertinent, relevant evidence bearing upon a claimant's disability status, but must provide sufficient discussion to allow the court to determine whether any rejection of potentially pertinent, relevant evidence was proper. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 –

04 (3d Cir. 2008) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000); *Cotter*, 642 F.2d at 706). In the present case, the ALJ adequately met his responsibilities under the law.

Plaintiff begins by arguing that the functional assessments by Dr. Nigam and Dr. Tatum indicating that Plaintiff was disabled were entitled to significant weight, and that the ALJ employed inappropriate standards in analyzing these opinions by engaging in his own interpretation of medical evidence as well as by picking and choosing GAF scores that suggested Plaintiff was not disabled. (ECF No. 9 at 4 – 7). However, a reading of the ALJ's opinion reveals that the ALJ did not disregard "medical opinion based solely upon his own 'amorphous impressions, gleaned from the record and from his own evaluation of [the claimant's] credibility,'" as suggested by Plaintiff. (ECF No. 9 at 5) (quoting *Kent v. Schweiker*, 710 F. 2d 110, 115 (3d Cir. 1983)).

A treating physician's opinion may be entitled to great weight – considered conclusive unless directly contradicted by evidence in a claimant's medical record – particularly where the physician's findings are based upon "continuing observation of the patient's condition over a prolonged period of time." *Brownawell v. Commissioner of Social Security*, 554 F.3d 352, 355 (3d Cir. 2008); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (citing *Rocco v. Heckler* 826 F.2d 1348, 1350 (3d Cir. 1987)). However, a showing of contradictory evidence and an accompanying explanation will allow an ALJ to reject a treating physician's opinion outright, or accord it less weight. *Id.* Additionally, the determination of disabled status for purposes of receiving benefits – a decision reserved for the Commissioner, only – will not be affected by a medical source simply because it states that a claimant is "disabled," or "unable to work." 20 C.F.R. §§ 404.1527(e), 416.927(e).

The ALJ's discussion of the evidence was more than sufficient to provide substantial evidence to support his ultimate conclusion to deny disability benefits. Of particular note is his meticulous account of the differences between what was reported by Dr. Nigam, Dr. Tatum, and Plaintiff's therapist during their regular treatment of Plaintiff, and the findings in Dr. Nigam and Dr. Tatum's functional capacity assessments. (R. at 14 – 35). Dr. Nigam's June 8, 2009 functionality assessment was given little weight because it included findings that had never been mentioned in treatment notes prior to and around the time the assessment was completed. (R. at 22 – 23). Plaintiff was assigned a GAF score of 50 in this assessment, but, as pointed out by the ALJ, the vast majority of Plaintiff's GAF scores were well above this mark. (R. at 22 – 23). The only medical note by Dr. Nigam at the time of the assessment which approximated a few of the findings in the functionality assessment, indicated that Plaintiff had been non-compliant with her medications, precipitating her decline. (R. at 22 – 23, 33, 415). Plaintiff had also failed to attend psychotherapy for the previous eighteen months. (R. at 22 – 23, 31, 413). The relatively conservative nature of Plaintiff's treatment throughout the record, despite the severe findings in the functionality assessment, was also of note. (R. at 30, 33).

Dr. Tatum's functionality assessment of May 18, 2010, was similarly given little weight because his prior treatment notes also did not include findings approximating the severity of what was provided in the assessment. (R. at 26 – 27, 34). Dr. Tatum had not even seen Plaintiff for nearly eight months prior to completing his assessment. (R. at 26 – 27, 34). The contrast between the functionality assessments of both doctors is particularly striking when compared to the functionality assessments completed by the state agency evaluators – assessments which, as the ALJ pointed out, more closely mirrored the objective findings within the notes of Plaintiff's treating medical professionals. (R. at 35).

Also, contrary to Plaintiff's assertion, the ALJ's discussion of the numerous GAF scores found throughout Plaintiff's treatment notes was not the sort of "cherry-picking" envisioned in prior case law; here, the ALJ explicitly raised each GAF score and thoroughly discussed his reasoning for the consideration accorded to each, based upon a weighing of the objective evidence accompanying each score in the respective medical notes as well as a comparison with objective evidence which preceded each score in the record as a whole. (R. at 13 – 45). This was not the sort of cursory acceptance of GAF scores supporting an ALJ's position, and concomitant omission of negative scores, found in other cases. *See Pounds v. Astrue*, 772 F. Supp. 2d 713, 721 – 26 (W.D. Pa. 2011) (Error found when the ALJ failed to address individual scores within a certain range, and failed to discuss the reasoning behind rejecting the scores); *Bonani v. Astrue*, 2010 WL 5481551 *7 – 8 (W.D. Pa. Feb. 17, 2011) (Error found when the ALJ "cherry picked" from the record by failing to address medical evidence which did not support his determination – particularly with respect to numerous low GAF scores).

In the present case, while the ALJ tended to accord greater weight to higher scores, and these scores supported the ultimate conclusion that Plaintiff was not disabled, the ALJ also explicitly provided evidence from the record to bolster his reasoning, and discussed every score – high or low. (R. at 14 – 35). Plaintiff fails to point to any major error which undermines his reasoning. Simply because the ALJ's determinations did not support the Plaintiff's position, does not mean that the ALJ was cherry-picking. Moreover, there is no impropriety in discussing individual GAF scores; indeed, courts often demand it where scores are incorporated as an integral part of a physician's report and where scores provide a longitudinal view of a claimant's progress. *See Pounds*, 772 F. Supp. 2d at 721 – 26; *Bonani*, 2010 WL 5481551 *7 – 8. Here, Dr. Nigam and Plaintiff's therapist regularly provided GAF scores over several years. The ALJ

provided ample discussion of each GAF score within the context of the accompanying medical notes and the preceding record as a whole, frequently finding that lower GAF scores were not justified when doctors' objective medical findings did not otherwise differ significantly between evaluations. (R. at 14 – 35). The lowest of Plaintiff's GAF scores – 50[5] – did indicate serious symptoms, but was an outlier. (R. at 14 – 35). The remainder of the GAF scores was in the slight to moderate range of impairment. (R. at 14 – 35). The ALJ's thorough discussion of each GAF scores was sufficient.

Plaintiff next argues that the ALJ incorrectly utilized evidence such as activities of daily living and Plaintiff's failure to report certain complaints to all of her doctors to discredit her subjective complaints. (ECF No. 9 at 7 – 10). An ALJ must give a claimant's subjective description of his or her inability to perform work serious consideration when this testimony is supported by competent evidence. *Schaudeck v. Commissioner of Social Security*, 181 F.3d 429, 433 (3d Cir. 1999). This necessitates a determination by the ALJ as to the extent to which a claimant is accurately stating the degree of his or her disability. *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) (citing 20 C.F.R. § 404.1529(c)). "[I]n all cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a thorough discussion and analysis of the objective medical and the other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's personal observations. The rationale must include a resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the individual's ability to work." *Schaudeck*, 181 F.3d at 433 (emphasis omitted).

---

[5]     The Court of Appeals for the Third Circuit has additionally held that a GAF score of 50 indicates that a claimant can perform some substantial gainful activity. *Hillman v. Barnhart*, 48 Fed. App'x 26, 29 n 1 (3d Cir. 2002).

As above, the ALJ thoroughly analyzed the medical evidence, as well as Plaintiff's own self-report and hearing testimony, to meticulously document inconsistencies which weakened the veracity of her complaints. (R. at 14 − 35). Defendant correctly points out that reported activities of daily living are a primary means of determining whether a claimant is accurately portraying his or her degree of limitation, and the ALJ did not err in using the activities of daily living to this end. *See Russo v. Astrue*, 421 Fed. App'x 184, 190 (3d Cir. 2011) (Claimant's subjective complaints are not credible to the extent that they are inconsistent with reports of daily activities); *Napper v. Astrue*, 2010 WL 2104149 *8 (W.D. Pa. Apr. 28, 2010) (Subjective complaints discredited when in conflict with accounts of daily activities); *Burns v. Barnhart*, 312 F. 3d 113, 129 − 30 (3d Cir. 2002) (No error found where the ALJ used a claimant's own description of daily activities to discredit subjective complaints that conflicted with earlier accounts); *Hartranft v. Apfel*, 181 F. 3d 358, 362 (3d Cir. 1999) (Evidence which will allow an ALJ to discredit a claimant's subjective complaints includes his "own description of his daily activities").

While Plaintiff validly points out that her failure to report all physical and psychological issues to all of her doctors – such as complaints of depression and anxiety to her gynecologist – is not an indicator that she does not suffer from those conditions, the ALJ's erroneous conclusions were overwhelmed by evidentiary support for his ultimate decision. (ECF No. 9 at 10). The inconsistencies between that which was claimed by Plaintiff and that which was actually recorded by her relevant treating medical sources, and in her own self-report, was strong evidence weighing against Plaintiff's credibility. (R. at 28 − 32). As such, the ALJ's decision to accord her subjective complaints less weight was properly supported.

## C.    CONCLUSION

Based upon the foregoing, the ALJ provided a thorough evidentiary basis to allow this court to conclude that substantial evidence supported his decision. Accordingly, it is respectfully recommended that Plaintiff's Motion for Summary Judgment be denied, Defendant's Motion for Summary Judgment be granted, and the decision of the ALJ be affirmed.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will constitute a waiver of any appellate rights.

_____
Lisa Pupo Lenihan
United States Magistrate Judge

Dated: December 22, 2011
.